UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| MID-AMERICA BUSINESS SYSTEMS,<br>Plaintiff,<br><br>v.<br><br>KEVIN SANDERSON, KARDEX HANDLING SOLUTIONS, LLC, RICHARD HUTSON, and KARDEX REMSTAR, LLC,<br>Defendants. | Civil No. 17-3876 (JRT/DTS)<br><br>**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

David H. Redden and John A. Fabian, III, **FABIAN MAY & ANDERSON, PLLP**, 1625 Medical Arts Building, 825 Nicollet Mall, Minneapolis, MN 55402, for plaintiff.

Daniel L. Lowin, **MESSERLI & KRAMER P.A.**, 1400 Fifth Street Towers, 100 South Fifth Street, Minneapolis, MN 55402, for defendants.

Plaintiff Mid-America Business Systems ("Mid-America") brings this action against its former employee, Kevin Sanderson; his new employer, Kardex Handling Solutions, LLC ("KHS"); Kardex Remstar, LLC ("Kardex Remstar"), and Richard Hutson, Senior Director of Sales for KHS. Mid-America alleges that Sanderson breached the client non-solicitation, employee non-solicitation, and confidentiality clauses of a contract he signed when he became a full-time employee at Mid-America. Mid-America also alleges that Sanderson tortiously interfered with Mid-America's prospective economic advantage and misappropriated Mid-America's trade secrets in violation of the

Minnesota Uniform Trade Secrets Act ("MUTSA") and the Federal Defend Trade Secrets Act ("FDTSA"). Mid-America alleges that KHS tortiously interfered with the contract signed by Sanderson, tortiously interfered with Mid-America's prospective economic advantage, and violated the MUTSA and the FDTSA. Mid-America accuses KHS and Hutson of defamation. Finally, Mid-America alleges that Kardex Remstar breached the employee non-solicitation clause of the companies' settlement agreement by hiring Sanderson through KHS.

Mid-America now moves for a temporary restraining order ("TRO") enjoining Sanderson from soliciting Mid-America's clients and employees, enjoining KHS from procuring breaches of Sanderson's contract, and enjoining both Sanderson and KHS from misappropriating Mid-America's trade secrets. Mid-America also seeks expedited discovery for a preliminary-injunction hearing.

Because the Court will find that Mid-America has not met its burden of showing a likelihood of success on the merits and a likelihood of irreparable harm to justify the extreme remedy of a TRO, the Court will deny Mid-America's motion for a TRO and deny its request for expedited discovery for a preliminary-injunction hearing.

**FACTUAL BACKGROUND**

**I.   THE PARTIES**

Mid-America is a "leading provider of large-scale storage and organization systems." (Decl. of Gil Roscoe Sr. ("Roscoe Decl.") ¶ 2, Aug. 22, 2017, Docket No. 7.) Kevin Sanderson worked for Mid-America as a service technician from June 2007 to

November 2016.  (*Id.* ¶¶ 3, 20-21; Decl. of Kevin Sanderson ("Sanderson Decl.") ¶¶ 2, 8, Sept. 13, 2017, Docket No. 27.)  Sanderson began working for KHS as a service technician in March 2017.  (Sanderson Decl. ¶ 12.)  KHS is majority owned by Kardex Remstar, which is the North American arm of a Swiss company that manufactures automated storage and retrieval systems.  (Decl. of Mark Dunaway ("Dunaway Decl.") ¶¶ 1-2, Sept. 13, 2017, Docket No. 29.)  Kardex Remstar operates internationally through networks of authorized dealers, of which KHS is one.  (*Id.*)

Mid-America was previously an authorized dealer for Kardex Remstar and was the exclusive dealer for Kardex storage and retrieval systems in a region covering parts of Indiana, Illinois, Minnesota, Wisconsin, North Dakota, and South Dakota.  (*Id.* ¶ 3.)  In November 2016, Kardex Remstar sent Mid-America of a list of deficiencies to cure and objectives to accomplish so that Mid-America could maintain its status as an authorized dealer.  (*Id.* ¶ 4.)  Kardex Remstar terminated its dealer contract with Mid-America on February 13, 2017, because Mid-America "failed to timely cure those deficiencies."  (*Id.*)  KHS then became Kardex Remstar's authorized dealer for most of the region Mid-America had previously covered.  (*Id.*)

## II. SANDERSON'S EMPLOYMENT AT MID-AMERICA

The parties dispute the terms of Sanderson's initial employment agreement: Sanderson says he was hired as a permanent employee in June 2007, while Mid-America claims that Sanderson was initially hired as a temporary employee and subject to a three-month probationary period.  (Sanderson Decl. ¶ 2; Roscoe Decl. ¶ 3.)  Mid-America

admits, however, that the probationary period was an "unwritten policy" when it hired Sanderson. (Second Decl. of Gil Roscoe Sr., ¶ 2, Sept. 18, 2017, Docket No. 38.) Sanderson denies ever being subject to a probationary period. (Sanderson Decl. ¶ 2.)

Mid-America alleges that Sanderson signed a "Non-Compete Agreement" when he became a full-time employee in September 2007, at which time Mid-America gave him additional training, access to confidential information, and pay increases.[1] (Roscoe Decl. ¶ 5.) Had he not signed the agreement, Mid-America would have terminated his employment. (*Id.*) Sanderson denies entering into any such agreement and has "no memory" of signing it. (Sanderson Decl. ¶ 2.)

During his employment, Mid-America sent Sanderson to Maine to be trained at a Kardex Remstar facility and also gave him further training specific to Kardex machines and products. (*Id.* ¶ 5; Roscoe Decl. ¶ 7.) In 2010, Sanderson became a "certified" Kardex Remstar technician, and Mid-America promoted him to Lead Service Technician. (Roscoe Decl. ¶ 6; Sanderson Decl. ¶ 6.) Sanderson asserts that his job involved only service work and that he was not involved in sales or solicitation of business. (Sanderson Decl. ¶ 4.) Mid-America claims that it trained Sanderson in a role focused on "selling and servicing" Kardex machines and alleges that some internal training that Mid-America gave him dealt with sales. (Roscoe Decl. ¶¶ 7-8.)

---

[1] What Mid-America refers to as the "Non-Compete Agreement" does not contain specific non-compete provisions (i.e., provisions prohibiting Sanderson from working for competitors); it contains only non-solicitation and confidentiality clauses. Nevertheless, the Court will use "Non-Compete Agreement" in referring to the agreement as that is how the document was titled.

Mid-America also alleges that it gave Sanderson access to non-public information regarding its customers, costs, pricing, operations, and business processes. (*Id.* ¶ 9.) This information included customer names and locations, customer preferences, maintenance and warranty schedules, and information about cost, pricing, and margins on new equipment – all information that Mid-America deems "confidential." [2] (*Id.*) This information also included an internal sales manual "containing extensive cost and price information for virtually all of Mid-America's parts and services." (*Id.* ¶ 10.) Mid-America asserts that the information in the internal sales manual provides a competitive advantage and that the company takes steps to protect this information, including requiring employees to sign confidentiality and non-compete agreements. (*Id.* ¶¶ 11-12.) Mid-America says that its customer relationships, which it has spent years developing, are also safe-guarded by these agreements. (*Id.* ¶¶ 13-14.)

---

[2] Kardex Remstar alleges that KHS legitimately has access to the information that Mid-America classifies as confidential or trade secrets because KHS is now the authorized dealer for Kardex Remstar. (Dunaway Decl. ¶ 13.) Kardex Remstar asserts that this information either initiated with Kardex Remstar or was shared with Kardex Remstar by Mid-America in the legitimate course of business. (*Id.* ¶¶ 5-8.) When Mid-America was an authorized dealer, it had access to the Kardex Remstar corporate website, where it could access sales, service, and support information for customers. (*Id.* ¶ 5.) Many leads, sales inquiries, and service requirements were routed to Mid-America based on region through this website. (*Id.*) Mid-America also had access to Kardex Remstar's dealer website. (*Id.*) On the dealer website, Mid-America not only had access to sales manuals and pricing information on all Kardex Remstar products, Mid-America also had access to Kardex Remstar's Customer Relationship Management database ("CRM"), in which Mid-America was required to "track leads, proposals, sales and support" on all Kardex Remstar equipment. (*Id.* ¶ 6.) Kardex Remstar collaborated with Mid-America through an assigned Regional Business Director to help build business in the region serviced by Mid-America. (*Id.* ¶ 7.) Kardex Remstar thus alleges that it already had access to "significant information and expertise" about Mid-America's "customer names and locations, buyer contacts . . . ; customer preferences, histories, and preventative maintenance and warranty schedules; and cost, pricing, and margins on new equipment . . . , and any and all sales matters." (*Id.* ¶ 8.)

Sanderson left his employment at Mid-America on Monday, November 7, 2016. (*Id.* ¶¶ 20-21.) The parties dispute why Sanderson left, although the reasons are not relevant to the present motion. Mid-America believes that, prior to leaving, Sanderson copied or transferred confidential information from his company-issued laptop and cell phone and then deleted data to "cover his tracks and impede Mid-America's ability to maintain service continuity for the customers he served." (*Id.* ¶ 22.) Sanderson denies transferring any data from the company electronics or taking anything confidential or proprietary, claiming that he ran a factory reset on the cell phone to remove his personal information and that he did not delete anything from the laptop. (Sanderson Decl. ¶ 9.)

### III. SANDERSON'S EMPLOYMENT AT KHS

Sanderson began working for KHS as a service technician in March 2017. (*Id*. ¶ 12.) His job is to "install and service Kardex Remstar products." (Decl. of Richard Hutson ("Hutson Decl.") ¶ 2, Sept. 13, 2017, Docket No. 28.) He is not involved in sales or soliciting business. (*Id*.) However, Mid-America alleges that Sanderson has been soliciting its customers.

First, Mid-America alleges that Sanderson made a service call at Viking Drill and Tool ("Viking") in May or June 2017 and "convinced it to cancel a planned purchase of a $100,000 machine from Mid-America." (Roscoe Decl. ¶ 25.) Mid-America learned about Sanderson's work from a Viking employee who showed Mid-America repair work that Sanderson had performed on Viking's old machine "to dissuade it from buying a new machine from Mid-America." (*Id*.) Mid-America finds Sanderson's contact with Viking

"suspect" because Viking uses a "legacy" version of Kardex's machines that predates Kardex's Customer Relationship Management program ("CRM"). (*Id.*) Mid-America alleges that, because Vikings information was not in the CRM, Kardex Remstar did not know that Viking had Kardex machines, thus Kardex Remstar could not have told KHS that Viking needed service. (*Id.*)

KHS denies these allegations, asserting that a Viking employee left a voicemail for KHS stating that Viking had some questions and wanted someone to look at its Kardex Remstar machine. (Hutson Decl. ¶ 5.) KHS assigned the work order to Sanderson because Viking was in his territory. (*Id.* ¶ 5.) Sanderson denies reaching out to Viking and denies attempting to solicit or sell the company anything. (Sanderson Decl. ¶ 14.) He claims that he told Viking that it would likely need to purchase a replacement machine soon because his repair was temporary. (*Id.*) KHS emphasizes that it was logical for Viking to call KHS because KHS is now the authorized Kardex Remstar dealer. (Hutson Decl. ¶ 5.) KHS also claims that Viking's contact information was in the CRM. (*Id.* ¶ 6.)

Second, Mid-America alleges that Sanderson visited the North Dakota location of Phoenix International ("Phoenix") on June 7, 2017, and "discouraged it from doing business with Mid-America." (Roscoe Decl. ¶ 27.) Phoenix also uses a "legacy" Kardex machine, thus Mid-America believes KHS likely learned [Phoenix's] identity from Sanderson. (*Id.* ¶ 27.) Mid-America also alleges that Phoenix had scheduled two service calls with Mid-America but later canceled them because Sanderson serviced the machine. (Decl. of Dante Reopelle, ¶¶ 2, 4, Sept. 18, 2017, Docket No. 39.) Sanderson does not

dispute that he visited Phoenix, but claims that he was assigned a service call for them and did not reach out to Phoenix prior to being assigned the call. (Sanderson Decl. ¶ 15.) Sanderson alleges that the Phoenix employee told him that Phoenix had reached out to Mid-America for service and that Mid-America told Phoenix that it "could no longer service [Phoenix's] units, so Phoenix reached out to KHS instead." (*Id.*) Sanderson denies selling anything to Phoenix and denies discouraging them from doing business with Mid-America. (*Id.*) KHS alleges that it already had a relationship with Phoenix's other locations, that the North Dakota location reached out to KHS for service, and that Sanderson was assigned to the call based on the geographic location. (Hutson Decl. ¶ 7.)

Third, Mid-America "believe[s] Sanderson helped KHS's owner, Dick Hutson, service another Mid-America client," Park Industries ("Park"). (Roscoe Decl. ¶ 28.) Hutson is not a certified technician, thus Mid-America "believe[s]" Hutson brought Sanderson in as the technician. (*Id.*) KHS and Sanderson deny these allegations, both claiming that Sanderson was not involved in the service call at Park, has not been to Park, and has not spoken to anyone there since starting work at KHS. (Hutson Decl. ¶ 8; Sanderson Decl. ¶ 16.)

Fourth, Mid-America alleges that it received a call from Horton Manufacturing asking to schedule service with Mid-America. (Decl. of Lisa Jaakola ¶ 3, Sept. 18, 2017, Docket No. 40.) On the call, Horton told Mid-America that Sanderson had called Horton and said he was a representative/technician for Kardex. (*Id.*)

Fifth and finally, Mid-America alleges that Sanderson has tried to convince Mid-America's employees to join him at KHS by telling one technician that KHS bought him

a new truck and telling another that he would make more money at KHS than at Mid-America. (Roscoe Decl. ¶ 29.) Sanderson claims that he remains friends with some of the Mid-America technicians he used to work with and that they likely saw him driving a new work-vehicle. (Sanderson Decl. ¶ 17.) He denies talking about the vehicle, suggesting that they would receive similar treatment at KHS, or otherwise encouraging them to leave Mid-America. (*Id.*) Sanderson says that he might have told a friend that he makes more money at KHS than he did at Mid-America but denies suggesting that the friend could also make more. (*Id.*) KHS asserts that it has had no further job openings for technicians in Sanderson's territory since it hired Sanderson. (Hutson Decl. ¶ 9.)

## IV. THE NON-COMPETE AGREEMENT

The disputed Non-Compete Agreement states, in relevant part:

> The Employee agrees that he or she will not, during or after the termination of this Agreement, disclose to any person any "confidential or proprietary information," which shall mean all information which is known to the Company and related to customer lists, trade secrets, pricing policies, price quotations, financial and operating information regarding the business or customers of the Company of which he or she may acquire or may have acquired knowledge during the performance of his or her work for the Company, and is not known to others or readily available to others from sources other than the Company.
> . . .
> The Employee agrees that during the term of this Agreement and for a period of one (1) year thereafter, he or she will not:
>
> Solicit or attempt to solicit any customer [or potential customer] of the Company other than for the benefit of the Company, or

> Directly or indirectly interfere or attempt to interfere with the Company's sources of supply or with the relationship of employer/employee, or contractor/subcontractor . . . , nor attempt to divert any such person for employment by or representation of the Company.

(Decl. of David H. Redden ¶ 2, Ex. 2, Sept. 13, 2017, Docket No. 26.) The date on the signed Non-Compete Agreement is September 25, 2007. (*Id.*)

## DISCUSSION

### I. STANDARD OF REVIEW

Mid-America moves for a TRO enjoining Sanderson from soliciting Mid-America's clients and employees, enjoining KHS from procuring breaches of Sanderson's contract, and enjoining both Sanderson and KHS from misappropriating Mid-America's trade secrets.

The Court considers four factors in determining whether to issue a temporary restraining order: (1) the likelihood that the moving party will succeed on the merits, (2) the threat of irreparable harm to the moving party, (3) the balance of harms as between the parties, and (4) the public interest. *See Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1036 n.2 (8th Cir. 2016) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); *see also Callerons v. FSI Int'l, Inc.*, No. 12-2120, 2012 WL 4097832, at *2 n.5 (D. Minn. Sept. 18, 2012) (explaining that these factors apply to both preliminary injunctions and temporary restraining orders). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."

*Dataphase*, 640 F.2d at 113. The burden of establishing the propriety of a TRO is on the movant. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

Based on the limited record before the Court, the Court finds that Mid-America has not demonstrated sufficient likelihood of success on the merits of any of its claims.

### A. Breach-of-Contract Claims Against Sanderson

Mid-America must show that it had a valid contract with Sanderson, that Mid-America performed any conditions precedent, that Sanderson breached that contract, and that Mid-America suffered damages. *Benfield, Inc. v. Moline*, No. 04-3513, 2006 WL 452903, at *9-10 (D. Minn. Feb. 22, 2006). Sanderson disputes the validity of the Non-Compete Agreement, but even assuming its authenticity, Mid-America has not demonstrated that the contract was valid because it has not shown that there was consideration for the Agreement.

Assuming Sanderson signed the Non-Compete Agreement, he did not do so until September 2007, several months after he began working for Mid-America. Because Sanderson was not required to sign the Non-Compete Agreement as a condition of his initial employment, Mid-America must show that there was independent consideration given in exchange for the Non-Compete Agreement. Being brought on as a permanent employee, together with other professional benefits such as training, can constitute sufficient consideration for such an agreement. *See D.L. Ricci Corp. v. Forsman*, No. C8-97-1597, 1998 WL 202595, at *3 (Minn. Ct. App. Apr. 28, 1998); *Hart Forms &*

*Sys., Inc. v. Goettsch*, No. C3-90-1791, 1990 WL 195473, at *3 (Minn. Ct. App. Dec. 11, 1990). But Mid-America has not shown that these benefits were bargained for in exchange for Sanderson's Non-Compete Agreement. Mid-America admits that its probationary policy was an unwritten rule and has not offered evidence that this policy was communicated to Sanderson.

Because Mid-America has not presented sufficient evidence to show that there was consideration, Mid-America has not shown a likelihood that the contract was valid. As a result, Mid-America has not demonstrated sufficient likelihood of success on any of its contract-related claims.

### 1. Client Non-Solicitation

Not only does Mid-America fail to demonstrate that there was consideration for the Non-Compete Agreement, Mid-America also fails at this early stage of the litigation to demonstrate a likelihood of proving that Sanderson breached the client non-solicitation clause. Mid-America's allegations regarding Sanderson's contacts with Viking, Phoenix, and Park are highly speculative. That Sanderson and KHS have performed services for some of Mid-America's customers alone is not sufficient to support the allegation that Sanderson solicited those clients or helped KHS to do so. Sanderson and KHS deny the allegation, and there are ample other explanations that would explain what Mid-America deems to be "suspicious" conduct. Moreover, it is not clear that the conduct alleged (responding to service calls, even ones that resulted in the sale of parts or services) constitutes solicitation. "Solicitation requires some element of attempted persuasion." *Benfield*, 2006 WL 452903, at *6. Without more support for Mid-America's highly

speculative allegations, Mid-America has not shown a likelihood of success on its claim against Sanderson for breach of the client non-solicitation agreement.

### 2. Employee Non-Solicitation

Not only does Mid-America fail to demonstrate that there was consideration for the Non-Compete Agreement, Mid-America also fails to demonstrate a likelihood of proving that Sanderson breached the employee non-solicitation clause. Again, "[s]olicitation requires some element of attempted persuasion." *Id.* Mid-America alleges that Sanderson told one Mid-America technician that KHS bought him a new truck and another that KHS would pay him better than Mid-America. Even assuming the truth of Mid-America's allegations, such actions likely do not rise to the level of solicitation. Without more support for Mid-America's allegations, Mid-America fails to show a likelihood of success on its claim against Sanderson for breach of the employee non-solicitation agreement.

### 3. Confidentiality

Mid-America also fails to demonstrate a likelihood of proving that Sanderson breached the confidentiality clause. Mid-America seems to be primarily concerned with disclosure of two pieces of information: (1) Mid-America's specific buyer contacts within its client companies and (2) Mid-America's cost and pricing information. The Court declines to determine whether such information constitutes confidential information because Mid-America has not sufficiently demonstrated that such information has been or is likely to be disclosed in violation of the contract.

"Minnesota courts do not grant injunctive relief solely because a former employer presumes that disclosure and solicitation are inevitable." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 873 (D. Minn. 2015) (quoting *United Prods. Corp. of Am. v. Cederstrom*, No. A05-1688, 2006 WL 1529478, at *5 (Minn. Ct. App. June 6, 2006)). Mid-America believes that Sanderson copied confidential information from his laptop and phone, but Sanderson denies these allegations. Mid-America also alleges that Sanderson disclosed to KHS confidential information about Mid-America's clients, which is how KHS got in contact with Viking, Phoenix, and Park. Both Sanderson and KHS deny that Sanderson has disclosed any confidential information to KHS and that he has solicited clients. Mid-America's allegations regarding Sanderson's disclosure of confidential information are merely speculative, thus Mid-America has not shown a likelihood of success on its claim against Sanderson for breach of the confidentiality agreement.

B. **Tortious Interference with Contract Claims Against KHS**

To prevail on a claim for tortious interference with a contract, Mid-America must show: (1) the existence of a valid contract; (2) KHS's knowledge of the contract; (3) KHS's intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom. *Harvey v. Wackenhut Corp.*, No. A05-1684, 2006 WL 1605547, at *4 (Minn. Ct. App. June 13, 2006); *see also Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998). For the same reasons that Mid-America fails to demonstrate that it is likely to succeed on the merits of its breach-of-contract claims against Sanderson, it fails to demonstrate that it is likely to succeed on the merits of its tortious interference with contract claims against KHS.

First, Mid-America has not shown that the Non-Compete Agreement was valid because it has not demonstrated consideration. Second, Mid-America has not demonstrated that Sanderson has breached or is likely to breach the Non-Compete Agreement. If there has been no breach, it cannot be said that KHS procured a breach. Thus, Mid-America has not demonstrated a likelihood of success on the merits of its claim against KHS for tortious interference with contract.

C. **Tortious Interference with Prospective Economic Advantage Claims Against Sanderson and KHS**

To prove tortious interference with prospective economic advantage, Mid-America must show: (1) Mid-America had a reasonable expectation of economic advantage; (2) Sanderson or KHS knew of that expectation; (3) Sanderson or KHS intentionally interfered with Mid-America's reasonable expectation of economic advantage, and the intentional interference was either independently tortious or in violation of a state or federal statute or regulation; (4) in the absence of Sanderson's or KHS's wrongful act, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and (5) Mid-America sustained damages. *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). Mid-America has not demonstrated a likelihood of success on this claim.

As a threshold issue, Mid-America "must specifically identify a third party with whom [it] had a reasonable probability of a future economic relationship." *Id.* at 221. Mid-America's "projection of future business with unidentified customers . . . is insufficient as a matter of law." *Id.* at 221-22. The only company Mid-America has

- 15 -

specifically identified under this claim is Viking, thus the Court will not consider claims related to other companies. Mid-America does not allege that Viking has canceled any service orders or maintenance contracts, thus the Court will consider only the allegation that Sanderson interfered with Mid-America's planned sale of a new machine to Viking.

Mid-America has not shown that it had a reasonable expectation of economic advantage from its planned sale to Viking. To support its claim, Mid-America must show that it had an "'expectation that the relationship eventually will yield the desired benefit,' rather than 'the more speculative expectation that a potentially beneficial relationship will arise.'" *Id.* at 221 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 957 (Cal. 2003)). A "mere offer to sell" is not sufficient. *Id.* at 222 (quoting *United Educ. Distribs., LLC v. Educ. Testing Serv.*, 564 S.E.2d 324, 329-30 (S.C. Ct. App. 2002)). In support of its allegations, Mid-America submitted a sales proposal it prepared for Viking and email communications surrounding that proposal; however, there is no evidence that this proposal ever became anything more than a proposal. Moreover, Mid-America has not demonstrated that Sanderson or KHS knew of the proposal or that they intentionally interfered with it. Thus, Mid-America has not demonstrated that it is likely to succeed on its claims of tortious interference with prospective economic advantage against Sanderson or KHS.

### D. Trade Secrets Claims Against Sanderson and KHS

Mid-America's submissions involving trade secrets lack specificity as to what precisely Mid-America alleges are trade secrets. Mid-America's primary concern again seems to be its specific buyer contacts and its cost and pricing information. The Court

does not decide whether such information constitutes trade secrets because Mid-America has not sufficiently demonstrated that misappropriation of such information has occurred or is likely to occur.

Courts may enjoin actual or threatened misappropriation. Minn. Stat. § 325C.02(a); 18 U.S.C. § 1836(b). But Mid-America "must demonstrate 'a high degree of probability of inevitable disclosure.'" *Cederstrom*, 2006 WL 1529478, at *5 (quoting *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 958 (D. Minn. 1999)). Sanderson and KHS deny Mid-America's allegations that they misappropriated or have threatened to misappropriate the purported trade secrets, and Mid-America presents little evidence in support of its speculative allegations. Thus, Mid-America has not shown a likelihood of success on the merits of its trade secrets claims against Sanderson and KHS.

## III. IRREPARABLE HARM

Mid-America also fails to demonstrate irreparable harm. "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins*, 346 F.3d at 844. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Here, Mid-America does not sufficiently describe any specific, certain, and imminent harms requiring equitable relief. Mid-America's claims are highly speculative, and the only damages asserted thus far are monetary.

## IV. EXPEDITED RECOVERY

Mid-America has requested expedited discovery to file a motion for a preliminary injunction. Because Mid-America fails to demonstrate a likelihood of irreparable harm, Mid-America has not shown that expedited discovery is necessary, and the Court will deny its request. Both parties appear interested in proceeding quickly in this case. Thus, the Court will refer the parties to the Magistrate Judge to determine a prompt discovery schedule, and the Magistrate Judge may consider whether expedited discovery is warranted.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Amended Motion for TRO [Docket No. 14] is **DENIED**.

DATED: October 6, 2017                      _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                                                 Chief Judge
                                          United States District Court